1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8  JOHNNIE LEE WALTERS,

9                                        Petitioner,          Case No. C14-903 RSL-BAT

10       v.                                                   **REPORT AND
                                                             RECOMMENDATON**

11  PATRICK GLEBE,

12                                       Respondent.

13          Petitioner Johnnie Lee Walters seeks 28 U.S.C. § 2254 habeas relief from his conviction

14  by jury verdict of one count of assault in the first degree (while armed with a firearm) and one

15  count of unlawful possession of a firearm in the second degree.  Dkt. 3.  The Court later granted

16  Mr. Walters leave to amend his petition to include an additional ground for relief.  Dkt. 23.  The

17  parties provided additional briefing on the fourth ground.  Dkts. 24 and 25.  Thus, Mr. Walters'

18  petition as amended presents this Court with four grounds for relief:  (1) insufficient evidence of

19  first-degree assault; (2) violation of right to present a necessity defense; (3) denial of right to

20  counsel of his choice; and (4) ineffective assistance of counsel.  Dkt. 3, at 5-8 (Grounds 1-3);

21  Dkt. 20, attached page (Ground 4).

22          The Court recommends DENYING the claims as Mr. Walters has failed to demonstrate

23  that the state-court adjudication of his claims was contrary to, or an unreasonable application of,

REPORT AND RECOMMENDATON- 1

1 established federal law, or was an unreasonable determination of the facts in light of the evidence

2 presented.  See 28 U.S.C. § 2254(d)(1)–(2).  The Court also recommends DENYING the

3 issuance of a certificate of appealability.

4                                            **BACKGROUND**

5 **A.      Statement of Facts**

6         The Washington Court of Appeals summarized the facts underlying Mr. Walters'

7 convictions as follows:

8              The State charged Johnnie Lee Walters, Jr., with one count of first degree
            assault while armed with a firearm and one count of second degree unlawful
9           possession of a firearm following a shooting at a South Seattle gas station.
            Surveillance cameras at the station captured much of the incident, and the video
10          recordings were played several times for the jury and witnesses during the course
            of the trial.

11

12            Detra Harris testified that she spent most of June 23, 2007, with her
            friends Treniqua Crowder and Deche Washington.  Late in the evening,
13          Washington became "stressed," and Harris drove him and Crowder to a nearby
            Union 76 gas station.  Appellant Walters and Charles Chappelle were already at
            the gas station when Harris arrived.

14

15            Harris parked her car near the air and water machines, and all three
            occupants got out.  Harris saw Chappelle approach Washington "cussing and
16          yelling obscenities."  Harris understood Chappelle to be urging Washington to
            fight, and the two men then raised their fists and moved around as though they
            were going to punch one another.

17

18            When Walters walked up next to her, Harris asked him why the two men
            were fighting.  Walters said that he did not know because Washington and
19          Chappelle were supposed to be friends.  Walters did not reply when Harris asked
            him to intervene, but Harris saw Walters place his hand near a shiny gun in his
            pocket or waistband.

20

21            A short time later, Washington walked away from Chappelle and removed
            a shotgun from Harris's car.  Washington then approached Chappelle and fired a
22          "warning shot" into the air.  One of the video recordings showed Washington
            walking toward Chappelle with the shotgun and Chappelle running away.

23            Shortly after Washington fired the shotgun, Walters pulled out a
            semiautomatic handgun and began firing toward Washington.  The video shows

REPORT AND RECOMMENDATON- 2

Washington, who was standing near a gas pump, turn suddenly and then stumble or fall to the ground, dropping his shotgun.  Harris testified that Washington lay on the ground moving from "side to side" and trying to cover his head while Walters continued firing "by his head."

Washington got up and ran in a "zigzag" pattern around the gas pumps and then across Rainier Avenue as Walters chased after him and continued shooting.  Harris immediately returned to her car, drove out of the gas station, and picked up Washington from a vacant lot across the street.  When Harris discovered that Washington was bleeding and appeared to be severely injured, she drove quickly to Harborview Hospital.  Harris noticed that Walters' car followed her for about a half-block before turning off.  At the hospital, surgeons repaired serious injuries to Washington's femoral artery and vein resulting from a gunshot wound to the left groin area.

At the gas station, police officers recovered one spent shotgun shell casing and a total of fifteen .40 caliber cartridge casings from a handgun.

After viewing the surveillance video, Walters gave a statement to police that was admitted at trial.  Walters said that he and Chappelle were at the gas station getting gas when Chappelle and Washington got into an argument.  Walters asserted that he acted in self-defense and began shooting at Washington after Washington fired the shotgun at Chappelle.

The trial court instructed the jury on self-defense, but refused to give Walters' proposed instruction on a necessity defense for the unlawful possession charge.  During closing argument, the deputy prosecutor conceded that Walters could have begun shooting in self-defense or in defense of Chappelle, but asserted that he committed the charged assault when he continued shooting after Washington dropped the shotgun and attempted to run away.

The jury found Walters guilty as charged, and the court imposed concurrent standard range terms for a total sentence of 198 months.

Dkt. 12, Exhibit 15, at 1-4.

**B.     State Procedural History**

      **1.     Direct Appeal**

Mr. Walters appealed his conviction to the Washington Court of Appeals.  Dkt. 12, Exhibit 10.  Mr. Walters also filed motions to be released on bond during the pendency of his appeal, first on a pro se basis and later a motion submitted by appellate counsel.  *Id.,* Exhibits 12-

14.  On April 18, 2011, the Court of Appeals rejected Mr. Walters' appellate claims and affirmed his conviction in an unpublished opinion.  *Id.*, Exhibit 15.  Shortly thereafter, the Commissioner of the Court of Appeals denied his motion to set appeal bond and the three-judge panel denied his motion to modify the Commissioner's ruling.  *Id.*, Exhibits 16 and 18.

Mr. Walters sought discretionary review by the Washington Supreme Court.  *Id.*, Exhibit 19.  Mr. Walters also filed a motion for discretionary review of the Court of Appeals' denial of his motion for an appeal bond.  *Id.*, Exhibit 20.  On September 7, 2011, the Supreme Court in separate orders denied the petition for review and the motion for discretionary review without comment.  *Id.*, Exhibits 21 and 22.  The Court of Appeals issued its mandate on October 5, 2011.  *Id.*, Exhibit 23.

### 2.  Motion for Bail and New Trial / Personal Restraint Petition

On October 8, 2010, while the direct appeal was pending, counsel for Mr. Walters filed a motion for bail and for a new trial with the superior court, arguing that he was denied his right to counsel of his own choosing and that his defense counsel provided ineffective assistance at trial by failing to call Charles Chappelle as a defense witness.  *Id.*, Exhibit 24.  On October 12, 2010, the superior court denied the motion for bail pending appeal and transferred the motion for a new trial to the Washington Court of Appeals to be considered as a personal restraint petition.  *Id.*, Exhibit 25.

After further briefing by the parties, the Chief Judge of the Court of Appeals dismissed the petition on May 3, 2013.  *Id.*, Exhibit 30.  Mr. Walters filed a pro se motion for discretionary review with the Washington Supreme Court raising the same denial of counsel and ineffective assistance arguments he presented to the lower courts. *Id.*, Exhibit 31.  On February 26, 2014, the Commissioner of the Washington Supreme Court denied Mr. Walters' motion.  *Id.*, Exhibit 32.

REPORT AND RECOMMENDATON- 4

1    The Court of Appeals issued a certificate of finality on April 30, 2014. *Id.,* Exhibit 33.

2                            **EVIDENTIARY HEARING**

3        The decision to hold a hearing is committed to the Court's discretion. *Schriro v.*

4 *Landrigan*, 550 U.S. 465, 473 (2007).  "[A] federal court must consider whether such a hearing

5 could enable an applicant to prove the petition's factual allegations, which, if true, would entitle

6 the applicant to federal habeas relief." *Landrigan*, 550 U.S. at 474.  In determining whether

7 relief is available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before

8 the state court. *Cullen v. Pinholster*, ---U.S.---, 131 S.Ct. 1388 (2011).  A hearing is not required

9 if the allegations would not entitle petitioner to relief under 28 U.S.C. § 2254(d).  *Landrigan*,

10 550 U.S. at 474.  "It follows that if the record refutes the applicant's factual allegations or

11 otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."

12 *Id.*; *see also Cullen*, 131 S. Ct. 1388 (2011).  The Court finds it unnecessary to hold an

13 evidentiary hearing because Mr. Walters' claims may be resolved on the existing state court

14 record.

15                                **DISCUSSION**

16 **A.**    **Claim 1 - Insufficient Evidence (First-Degree Assault Charge)**

17        In his first ground for relief Mr. Walters claims the evidence presented at trial was

18 constitutionally insufficient to support the jury's guilty finding for first-degree assault.

19        The Constitution forbids the criminal conviction of any person except upon proof of guilt

20 beyond a reasonable doubt. *In re Winship*, 397 U.S. 358 (1970).  When evaluating a claim of

21 insufficiency of the evidence to support a conviction, the reviewing court must decide "whether,

22 after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

23 could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v.*

REPORT AND RECOMMENDATON- 5

1  *Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  "*Jackson* leaves juries broad

2  discretion in deciding what inferences to draw from the evidence presented at trial, requiring

3  only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'"  *Coleman v.*

4  *Johnson*, 132 S. Ct. 2060, 2064 (2012) (*quoting Jackson*, 443 U.S. at 319).  The jury is entitled

5  to believe the State's evidence and to disbelieve the defense's evidence.  *Wright v. West,* 505

6  U.S. 277, 296 (1992).

7        The *Jackson* inquiry focuses not on whether the trier of fact made the *correct* guilt or

8  innocence determination but on whether it made a *rational* decision to convict or acquit.

9  *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (emphasis in original); *see also Coleman v.*

10  *Johnson*, 132 S. Ct. at 2065 ("[T]he only question under *Jackson* is whether [the jury's] finding

11  was so insupportable as to fall below the threshold of bare rationality.").  The *Jackson* standard

12  requires the reviewing court to keep in mind the requirements of state law: "the standard must be

13  applied with explicit reference to the substantive elements of the criminal offense as defined by

14  state law."  *Jackson*, 443 U.S. at 324 n.16.

15        The Washington Court of Appeals considered Mr. Walters' insufficient evidence claim

16  on direct appeal and, after reviewing the testimony and the video evidence, concluded that a

17  reasonable jury could have convicted Mr. Walters on the basis of the evidence presented at trial:

18        At trial, the State conceded that Walters was acting in self-defense when
he started shooting after Washington fired the shotgun.  But the jury also

19  considered evidence that shortly after Walters began shooting, Washington
dropped the shotgun and then stumbled or fell to the ground.  Walters continued

20  shooting as Washington lay on the ground.  When Washington got up, he ran
away from where Walters was shooting, around one of the gas pump islands, and

21  then across the street.  The surveillance video shows Walters chasing Washington
and continuing to shoot, as Washington's shotgun lay on the ground nearby.

22

23        Evidence that Washington dropped the shotgun, fell to the ground, and
then attempted to run away after Walters started shooting supported a reasonable
inference that Washington no longer posed an imminent threat to Walters or

REPORT AND RECOMMENDATON- 6

Chappelle and that Walters was aware of those changed circumstances.  Viewed in the light most favorable to the State, the fact that Walters then chased and continued shooting at an apparently unarmed Washington was sufficient to permit the trier of fact to find beyond a reasonable doubt that Walters' use of force was more than necessary under the circumstances or that there was a reasonable alternative to the use of force.  The evidence was therefore sufficient to satisfy the State's burden of disproving Walters' claim of self-defense.

Walters contends that Washington could have had another weapon and that the evidence did not establish that he knew Washington was wounded.  He argues that his actions in continuing to shoot were therefore reasonable given the stressful nature of the incident and its short duration.  But these arguments are properly directed to the trier of fact.  The jury was entitled to assess the credibility of the witnesses, view the videos, and draw contrary inferences.  "Credibility determinations are for the trier of fact and cannot be reviewed on appeal."

Walters also contends the evidence was insufficient to establish that he assaulted Washington with the intent to cause great bodily harm.  He points to evidence suggesting that he was firing "slightly" over Washington's head, that he did not hit Washington after Washington fell, and that he did not express any personal animosity towards Washington.

A person is guilty of assault in the first degree if, with intent to inflict great bodily harm, he or she assaults another with a firearm.  Specific intent can be inferred as a logical probability from all the facts and circumstances.

Although the surveillance video cannot establish with absolute certainty precisely where Walters was aiming, Harris testified that after Washington dropped the shotgun and fell to the ground, Walters fired multiple shots by his head.  Walters then chased after Washington and continued to fire in the general direction of Washington's back.  Viewed in the light most favorable to the State, the evidence was sufficient to establish that Walters assaulted Washington with the intent to commit great bodily harm.

Dkt. 12, Exhibit 15, at 5-7 (footnotes and citations omitted).

To convict Mr. Walters of the crime of first-degree assault, the State was required to prove that Mr. Walters assaulted Washington "with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death."  RCW 9A.36.011(1)(a).  This is a specific intent crime requiring proof of "intent to produce a specific result, as opposed to intent to do the physical act that produces the result."  *State v. Elmi*, 166 Wn.2d 209, 215, 207 P.3d 439

REPORT AND RECOMMENDATON- 7

1   (2009). Specific intent may be inferred from all the facts and circumstances, including the

2   manner in which the assault was committed and the nature of the prior relationship between the

3   alleged assailant and the victim. *State v. Wilson*, 125 Wn.2d 212, 217, 883 P.2d 320 (1994).

4   Self-defense, where applicable, is a complete defense that negates the mental state of intent and

5   shifts the burden to the State of disproving self-defense beyond a reasonable doubt. *State v.*

6   *Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997). Self-defense is a lawful act "[w]henever

7   used by a party about to be injured, or by another lawfully aiding him or her, in preventing or

8   attempting to prevent an offense against his or her person, or a malicious trespass, or other

9   malicious interference with real or personal property lawfully in his or her possession, in case the

10   force is not more than is necessary." RCW 9A.16.020(3).

11       Evidence of self-defense is assessed by the trier of fact "from the standpoint of the

12   reasonably prudent person, knowing all the defendant knows and seeing all the defendant sees."

13   *State v. Janes*, 121 Wn.2d 220, 238, 850 P.2d 495 (1993). A person may use the same amount of

14   force to defend another person as he may use to defend himself, so long as the person being

15   defended is present at the time of the incident. *State v. Jarvis*, 160 Wn. App. 111, 121, 246 P.3d

16   1280 (2011); *State v. Trevino*, 10 Wn. App. 89, 99, 516 P.2d 779 (1974).

17       Considered in the light most favorable to the State, the evidence was sufficient to support

18   the jury's conclusion that Mr. Walters used unlawful force and intended to inflict great bodily

19   harm on Deche Washington. The jury heard the testimony of Detra Harris, an eyewitness to the

20   episode, and also viewed the security camera video recordings from the scene at the Unocal 76

21   gas station. Dkt. 12, Exhibit 4, at 128-40; *see also* Exhibit 28, App. L (State's trial exhibit 105)

22   at first camera ("7-Pumps"), 10:21. Ms. Harris testified that as Washington and Chappelle

23   "squared up" to fight, she saw Mr. Walters flash a handgun. *Id.*, Exhibit 4, at 132. Washington

REPORT AND RECOMMENDATON- 8

1   retrieved a 12-gauge shotgun from Harris's car and walked toward Chappelle, firing a "warning

2   shot" into the air.  *Id*.  Chappelle ran away with his hands in the air, but Mr. Walters remained

3   and walked around the gas pumps in the direction of Washington.  *Id.*, Exhibit 28, App. L, at

4   10:21:09-18.  After Mr. Walters shot him, Washington turned around and doubled over,

5   clutching his side.  *Id.,* Exhibit 4, at 138; Exhibit 28, App. L, at 10:21:22-25.  Washington then

6   fell to the ground, dropping the shotgun in the process, and did not pick up the shotgun again.

7   *Id.,* Exhibit 4, at 138; Exhibit 28, App. L, at 10:21:22-25.

8        Mr. Walters fired several shots at Washington as Washington lay unarmed on the ground

9   trying to cover his head.  *Id*.  Mr. Walters continued shooting at Washington as Washington

10  scrambled to his feet and fled from the gas station into the street, running in a "zigzag" pattern

11  "trying to dodge the bullets."  *Id*. at 138-39; Exhibit 28, App. L, at 10:21:28-33.  Mr. Walters

12  continued to shoot at Washington as he chased him out of the gas station lot.  *Id.*, Exhibit 4, at

13  138; Exhibit 28, App. L, at 10:21:27-33.  (The detectives later collected one 12-gauge shotgun

14  shell casing from the crime scene and a total of 15 .40 cal. casings likely from Mr. Walters'

15  firearm.  *Id.*, Exhibit 4, at 78-79, 89; Exhibit 5, at 67-68).  Harris ran to her car and picked up

16  Washington in a vacant lot across the street; he was weak, barely conscious, and barely

17  breathing.  *Id.*, Exhibit 4, at 132, 141-42.  She sped off to Harborview hospital at high speeds,

18  with Walters trailing them briefly before he turned off.  *Id*. at 142-44.  Washington had lost a

19  tremendous volume of blood.  *Id*. at 143.  Paramedics at Harborview initially pronounced

20  Washington dead on arrival, but Washington was taken to the operating room.  He received

21  blood transfusions, the bullet wound to his femoral artery and femoral vein was repaired, and he

22  survived.  *Id.*, Exhibit 5, at 87-88.

23        As noted by the state appellate court, the State conceded that Mr. Walters may have

REPORT AND RECOMMENDATON- 9

1   initially acted in self-defense or in defense of Chappelle, but argued that the assault started at the

2   point when Mr. Walters continued to pursue and fire at Washington after Washington was hit

3   and had dropped the shotgun.  *Id.*, Exhibit 4, at 11-12, 15 (opening statement); Exhibit 5, at 119,

4   122-23 (closing).  Throughout trial the defense contended that Mr. Walters had used lawful and

5   reasonable force at all times to defend Chappelle.  *Id.*, Exhibit 4, at 18-19. Defense counsel's

6   closing argument attempted to recreate the fear and confusion at the time of Washington's

7   shotgun blast, dramatically exclaiming "Boom! Rack!" and asking the jury, "What would you

8   do? What's reasonable under the circumstances?"  *Id.*, Exhibit 5, at 144.  He asserted "[t]here is

9   only one answer, and that's to try to defend yourself from those blasts, to try to defend your

10   friend from those blasts."  *Id.* at 145.  The jury rejected the defense's arguments and convicted

11   Mr. Walters as charged.

12      Mr. Walters fails to show the state court decision of this claim was contrary to or an

13   unreasonable application of clearly established federal law and therefore, federal habeas relief as

14   to Claim 1 should be denied.

15   **B.      Claim 2 – Affirmative Defense of Necessity**

16      In his second ground for relief, Mr. Walters argues that the trial court, by refusing to give

17   a jury instruction on the defense of necessity, effectively denied him the right to present a

18   defense to the unlawful possession of a firearm count.

19      At trial, Mr. Walters' defense counsel requested a necessity instruction.  *Id.*, Exhibit 5, at

20   110-11.  The State opposed the request, arguing that the evidence showed Mr. Walters possessed

21   the firearm before any necessity arose.  *Id.* at 111-12.  Based on the evidence presented at trial,

22   the trial court denied the defense request:

23          I think – I am not going to give the instruction.  I think these facts are
            really quite similar to Jeffrey ….

REPORT AND RECOMMENDATON- 10

1

2           At this point I will take the burden and the facts most favorable to the
    defense in looking at the evidence, because that would seem to me to be the
3   appropriate way to look at it, but we have seen this videotape from three different
    angles.

4           We don't see Mr. Walters going back to a car to get a gun. He's out there,
    and he shoots. From the videotape, there just is no evidence that he was not in
5   possession of the gun before the incident – before the shooting arose from Mr.
    Washington. So I am declining to give the instruction.

6

7   Dkt. 12, Exhibit 5, at 112-13.

8           On direct appeal, the Washington Court of Appeals concluded that Mr. Walters was not

9   entitled to rely on the necessity defense because the evidence and testimony showed he was

10  already in possession of the gun before the shooting incident began:

11          Harris testified that Walters displayed a handgun while Washington and
    Chappelle were still facing off, before Washington retrieved the shotgun from
12  Harris's car. A short time later, Walters began shooting and chasing Washington
    after he discharged the shotgun. Although Walters' car remains visible
13  throughout the incident on one of the surveillance videos, there is no indication
    that Walters retrieved the gun from the car or from anyone else in response to
    Washington's actions.
14
            Even when viewed in the light most favorable to Walters, the evidence
15  established only that he possessed the pistol before any possible threat arose. The
    trial court properly refused to instruct the jury on the proposed necessity defense.
16
    Dkt. 12, Exhibit 15, at 9 (footnotes omitted).
17
            "As a general proposition a defendant is entitled to an instruction as to any recognized
18
    defense for which there exists evidence sufficient for a reasonable jury to find in his favor."
19
    *Mathews v. United States*, 485 U.S. 58, 63 (1988). Failure to instruct the jury on the defendant's
20
    theory of the case may be reversible error if the defense theory is legally sound and evidence in
21
    the case makes it legally applicable. *Clark v. Brown*, 450 F.3d 898, 904-05 (9th Cir. 2006)
22
    (citing cases). But "not every ambiguity, inconsistency, or deficiency in a jury instruction rises
23
    to the level of a due process violation. The question is 'whether the ailing instruction … so

REPORT AND RECOMMENDATON- 11

infected the entire trial that the resulting conviction violates due process.'"  *Middleton v. McNeil*,

541 U.S. 433, 437 (2004) (*quoting Estelle v. McGuire*, 502 U.S. 62, 72 (1991)).  In habeas cases,

the burden on the petitioner is "especially heavy" where the alleged error involves the failure to

give an instruction, as compared to an erroneous instruction, because "[a]n omission, or an

incomplete instruction, is less likely to be prejudicial than a misstatement of the law."

*Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  Habeas relief may not be granted unless the

instructional error had "substantial and injurious effect or influence in determining the jury's

verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

Washington law recognizes the affirmative defense of necessity in appropriate cases

where circumstances forced the defendant to take unlawful action in order to avoid a greater

injury.  *State v. Diana*, 24 Wn. App. 908, 913, 604 P.2d 1312 (1979).  The defense is applicable

to the crime of unlawful possession of a firearm where the defendant demonstrates:

> (1) he was under unlawful and present threat of death or serious injury, (2) he did
> not recklessly place himself in a situation where he would be forced to engage in
> criminal conduct, (3) he had no reasonable alternative, and (4) there was a direct
> causal relationship between the criminal action and the avoidance of the
> threatened harm.

*State v. Jeffrey*, 77 Wn. App. 222, 225, 889 P.2d 956 (1995).  The necessity defense is not

available, however, if the defendant was armed with a firearm prior to facing an immediate

threat.  *See State v. Parker*, 127 Wn. App. 352, 355-56, 110 P.3d 1152 (2005) (trial court

properly refused necessity instruction where defendant routinely carried a firearm for protection

and did not face any immediate or specific threat); *State v. Jeffrey*, 77 Wn. App. at 227 (trial

court properly denied necessity instruction where defendant armed himself without evidence that

alleged intruder could have immediately entered defendant's home or caused serious bodily

injury or death*); see also State v. Stockton*, 91 Wn. App. 35, 43-44, 955 P.2d 805 (1998) (trial

court properly gave necessity instruction where the evidence showed defendant grabbed the gun from the person who was assaulting him).

Mr. Walters fails to show the state court decision of this claim was contrary to or an unreasonable application of clearly established federal law and therefore, federal habeas relief as to Claim 2 should be denied.

**C.      Claim 3 – Denial of Request to Substitute Counsel**

In his third ground for relief Mr. Walters argues that the trial court denied him his right to counsel of choice by denying his motion to substitute counsel.

On the scheduled first day of trial in his case, December 10, 2008, Mr. Walters' attorney Brian Todd moved to withdraw from the case based on a conflict of interest and proposed that attorney Santiago Juarez be allowed to substitute for him.  Dkt. 12, Exhibit 1, at 4.  Juarez appeared telephonically from his home in New Mexico, joined in Todd's request, and stated he could be ready for trial in Mr. Walters' case in mid-February or early March of 2009.  *Id*. at 4-5. The prosecutor objected to the lengthy continuance, mainly because it was being requested on what was supposed to be the first day of trial.  *Id*. at 7.  Before resolving the issue, the trial court (Judge Palmer Robinson) wanted to explore the nature of the alleged conflict Todd had alluded to at the outset.  *Id*. at 7-8.  Todd was unable to reveal the basis for the conflict in open court, so the court took a brief recess to meet with Todd in chambers and discuss the issue.  *Id*. at 8.  The basis for the alleged conflict does not appear in the transcript, but Mr. Walters later summarized the situation in a declaration he submitted along with his personal restraint petition.  According to Mr. Walters, he became disenchanted with Todd's representation of him "[w]hen I realized that [the case] was not going to go away."  *Id.*, Exhibit 24, attached Declaration of Johnnie Walters Jr., at 1.  He contacted Juarez because it appeared the case was indeed headed for trial.

1  *Id.* He told Todd he was "not happy" with his representation, he "could not pay for him

2  anymore," and that he had asked Juarez to take over.  *Id.* at 2.

3          After the recess, the trial court stated its conclusion that there was neither a conflict of

4  interest nor a basis for withdrawal:

> 5  THE COURT: I don't find there to be a conflict such as would warrant me either
> – well, continuing the trial date or allowing Mr. Todd to withdraw.
>
> 6
>
> 7  MR. TODD: I guess, your Honor, would it be a choice of counsel issue? That Mr.
> Walters has a right to choose which counsel?
>
> 8  THE COURT: Not on the trial date he doesn't. … You can't wait until trial and
> then say, well, actually, now that I thought about it, I'd rather have somebody else
> 9  represent me and I need a continuance of three months. … I don't find that there's
> a conflict such as would warrant appointing new – or not appointing, but
> 10  substitution of counsel and continuing the trial date on the trial date.  And that's
> really all I've been asked to do.
> 11  ….
>
> 12  MR. JUAREZ: I will talk with Mr. Todd after this and if he's comfortable with it,
> and could give me discovery, I'll associate with him.
> 13  ….
>
> 14  THE COURT: My ruling, Mr. Juarez, is not – it is with respect to – it's limited to
> that Mr. Todd hasn't presented a conflict.  It is not a reflection on who the
> 15  proposed substituting counsel is.
> ….
> 16
>
> 17  MR JUAREZ:  I'll talk with Mr. Todd after this. … I know my client wants me
> there.  And if Mr. Todd is comfortable with allowing me to sort of second chair
> this with him then we'll do it that way.
> 18
>
> 19  THE COURT: Okay.

20  Dkt. 12, Exhibit 1, at 8-11; *see also* Exhibit 6 (written order signed by Judge Robinson).

21          One week later, on December 17, 2008, Judge Susan Craighead signed an order

22  appointing Todd to serve as Mr. Walters' counsel "at public expense."  *Id.*, Exhibit 7.  Mr.

23  Walters' trial was continued multiple times at the request of the State and/or defense counsel.

*See id.,* Exhibit 28, App. I (continuance orders).  The case ultimately went to trial on August 17,

REPORT AND RECOMMENDATON- 14

2009, some eight months later.  *Id.*, Exhibit 4. Between December 10, 2008 and the start of trial, neither Mr. Walters nor Juarez raised the issue of substitution again and Juarez did not appear on Mr. Walters' behalf or otherwise attempt to join the defense team.

The Washington Court of Appeals rejected Mr. Walters' claim that he had been denied counsel of his choice:

> Walters now characterizes the trial court's ruling as a denial of Juarez's motion to appear and represent him, claims the ruling lacked a clearly articulated reason, and complains that the case did not go to trial until August, almost eight months after Juarez asked for only 30 to 60 days to prepare for trial. Walters fails to demonstrate grounds for relief. The trial court sufficiently limited and explained its ruling.  Nothing in the record suggests that the trial court prevented Juarez from associating with Todd or participating in the case as he stated on the record that he intended to do.  And nothing in the record indicates that the December 10 ruling somehow prevented Walters from requesting new counsel or Juarez from appearing in the case any time over the next several months as the case was continued for other reasons.

Dkt. 12, Exhibit 30, at 4-5. The Washington Supreme Court agreed and denied Mr. Walters' motion for discretionary review:

> The … facts balance in favor of disallowing the substitution and continuance at that time. The request was made on the first day of trial.  Mr. Walters has still not shown the existence of an actual conflict of interest justifying substitution. His general unhappiness with Mr. Todd's lack of success in getting the case dismissed was insufficient to justify substitution. … and Mr. Juarez needed a significant amount of time to prepare if he was to take over from Mr. Todd.

Dkt. 12, Exhibit 32, at 2-3 (citation omitted).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."  U.S. Const. amend. VI.  An element of this right is the defendant's "right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds."  *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (*quoting*

1   *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624-25 (1989)); *see also Powell v.*

2   *Alabama*, 287 U.S. 45, 53 (1932) ("It is hardly necessary to say that the right to counsel being

3   conceded, a defendant should be afforded a fair opportunity to secure counsel of his own

4   choice.").  The erroneous denial of the right to counsel of choice qualifies as structural error; that

5   is, the defendant who establishes that his right to counsel of choice was violated need not

6   demonstrate prejudice in order to be entitled to relief, as would a defendant who is claiming that

7   counsel provided ineffective assistance.  *Gonzalez-Lopez*, 548 U.S. at 150.  "[T]he right at stake

8   here is the right to counsel of choice, not the right to a fair trial; and that right was violated

9   because the deprivation of counsel was erroneous.  No additional showing of prejudice is

10  required to make the violation 'complete.'"  *Id*. at 146.

11      However, the right to counsel of choice is "circumscribed in several important respects."

12  *Wheat v. United States*, 486 U.S. 153, 159 (1988).  A defendant does not have the right to be

13  represented by (1) an attorney he cannot afford, (2) an attorney who is not willing to represent

14  him, (3) an attorney who has a conflict of interest, or (4) a person (other than himself) who is not

15  a member of the bar.  *Id*.  A trial court has "wide latitude in balancing the right to counsel of

16  choice against the needs of fairness, … and against the demands of its calendar."  *Gonzalez-*

17  *Lopez*, 548 U.S. at 152 (*citing Wheat*, 486 U.S. at 163-64; *Morris v. Slappy*, 461 U.S. 1, 11-12

18  (1983)).  Thus, trial courts have the discretion to make scheduling and other decisions that may

19  have the effect of excluding a defendant's first choice of counsel.  *Id*.  With regard to the timing

20  of a defendant's request to substitute counsel, "only [a trial court's] unreasoning and arbitrary

21  'insistence upon expeditiousness in the face of a justifiable request for delay'" violates the Sixth

22  Amendment.  *Morris v. Slappy*, 461 U.S. at 11-12 (*quoting Ungar v. Sarafite*, 376 U.S. 575, 589

23  (1964)).

The trial court did not rule that Juarez could not serve as Mr. Walters' defense counsel. Rather, the court ruled that Mr. Walters' subjective dissatisfaction with Todd's inability to make his case "go away" was not a sufficient basis for Todd's withdrawal and continuance of the then scheduled trial date of December 10, 2008.  The court did not prohibit Juarez from associating with Todd or "second-chairing" the case with Todd, or even taking over the case from Todd. Mr. Walters waited until the first day of trial to request substitute counsel, and the proposed substituting counsel was not even within the state of Washington at that time and was not available for trial for at least two or three months.

In addition, Mr. Walters never renewed his motion to substitute counsel at a later time, despite the fact that his trial was continued several times and did not begin for another eight months.  And, although Juarez advised the court that he intended to work alongside Todd, he never actually appeared on Mr. Walters' behalf at any time.

Mr. Walters fails to show the state court decision of this claim was contrary to or an unreasonable application of clearly established federal law and therefore, federal habeas relief as to Claim 3 should be denied.

**D.      Claim 4 – Ineffective Assistance of Counsel**

In his fourth ground for relief, Mr. Walters contends that his defense attorney provided ineffective assistance of counsel at trial because he failed to call Charles Chappelle as a defense witness.  He contends that counsel failed to conduct any pre-trial investigation into whether Mr. Chapelle could have offered exculpatory evidence as to Mr. Walters' intent that day.  Mr. Walters contends that Mr. Chappelle had a lot to say about the incident as evidenced by Mr. Chappelle's declaration.

Charles Chappelle was with Mr. Walters at the Union 76 station and started the argument

REPORT AND RECOMMENDATON- 17

with Deche Washington that eventually led to the shooting.  According to the declaration he later

submitted, Mr. Chappelle would have testified that Mr. Walters saved his life by firing back at

Washington when Washington fired the shotgun.  Dkt. 12, Exhibit 24, attached Declaration of

Chappelle, at 2.  Mr. Chappelle claimed Washington appeared "like surprised" when Walters

began shooting at him, and Washington "hit the ground with the shot gun." *Id*. at 2.  Chappelle

yelled to Walters that "[t]he MF is going for his shit, shoot the MF." *Id.*  In Chappelle's

recounting of the incident, Mr. Walters then shot in Washington's direction, Washington got into

his SUV and drove off, and Chappelle and Walters fled in the opposite direction. *Id.*  Mr.

Chappelle states he believed Washington "was heading back towards the shot gun" during the

shooting, presumably to re-arm himself and fire at Walters or Chappelle. *Id*. at 3.

> It appeared to me throughout the shooting that Johnnie was shooting high, not like
> intending to shoot Deche but scare him off, but things happened so fast and I was
> in fear for my life. There was no question in my mind that night but that Deche
> intended to kill me.

*Id*. at 2.

The Washington Court of Appeals on direct appeal summarized the security camera

video of the incident as follows:

> [S]hortly after Walters began shooting, Washington dropped the shotgun
> and then stumbled or fell to the ground.  Walters continued shooting as
> Washington lay on the ground.  When Washington got up, he ran away from
> where Walters was shooting, around one of the gas pump islands, and then across
> the street.  The surveillance video shows Walters chasing Washington and
> continuing to shoot, as Washington's shotgun lay on the ground nearby.

Dkt. 12, Exhibit 15, at 5-6.  A review of the security camera video confirms that this summary is

accurate.  Dkt. 12, Exhibit 28, App. L (State's trial exhibit 105) at first camera ("7-Pumps"),

10:21:25-33.

The physical evidence collected at the crime scene – which included one spent 12-gauge

REPORT AND RECOMMENDATON- 18

1  shotgun shell fired by Washington, compared to the fifteen .40 caliber casings from Mr. Walters'

2  pistol – further corroborated the State's theory that Mr. Walters responded with far more force

3  than was reasonable under the circumstances.  Dkt. 12, Exhibit 15, p. 3.

4        The Sixth Amendment guarantees a criminal defendant the right to effective assistance of

5  counsel.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Claims of ineffective assistance

6  of counsel are evaluated under the two-prong test set forth in *Strickland*.  Under *Strickland*, a

7  defendant must prove (1) that counsel's performance was deficient and, (2) that the deficient

8  performance prejudiced the defense.  *Strickland*, 466 U.S. at 687.

9        With respect to the first prong of the *Strickland test*, a petitioner must show that counsel's

10  performance fell below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 688.

11  Judicial scrutiny of counsel's performance must be highly deferential.  *Id*. at 689.  There is a

12  strong presumption that counsel's performance fell within the wide range of reasonably effective

13  assistance.  *Id.*  The second prong of the *Strickland* test requires a showing of actual prejudice

14  related to counsel's performance.  In order to establish prejudice, a petitioner "must show that

15  there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

16  proceeding would have been different.  A reasonable probability is a probability sufficient to

17  undermine confidence in the outcome."  *Id*. at 694.

18        In its adjudication of this claim, the Washington Court of Appeals recited *Strickland's*

19  two-part test and concluded that the claim was without merit:

20            To establish prejudice, Walters contends that the jury heard "less than the
        full story to decide whether Mr. Walters used excessive force that night and was

21        guilty of the charged conduct."  He argues that Chappelle's perception of the
        events could have changed the jury's interpretation of the surveillance video and

22        could have reasonably resulted in an acquittal.  But, as the State points out, the
        surveillance video and Harris's testimony indicated that Walters continued to

23        chase and shoot at Washington as he ran away from the dropped shotgun and the
        police recovered one shotgun shell and fifteen handgun cartridge casings at the

REPORT AND RECOMMENDATON- 19

scene.  Chappelle's declaration offers no reasonable explanation for Walters'
decision to continue chasing and shooting Washington after he began running
away from the dropped shotgun.  Because the State conceded at trial that the
initial shots could have been self-defense and nothing in the record indicates that
Chappelle's expected testimony would have been relevant to the contested issue
at trial of the absence of self-defense once Washington began to run away,
Walters fails to demonstrate prejudice resulting from defense counsel's failure to
interview Chappelle.

Exhibit 30, at 5-6.

The Commissioner of the Washington Supreme Court similarly concluded that the claim

of ineffective assistance was without merit.

> Mr. Walters' assault charge was based on his act of shooting of Deche
> Washington at the gas station.  Mr. Walters claimed he was trying to defend
> himself or Charles Chappelle after Mr. Washington fired a shotgun at Mr.
> Chappelle.  Mr. Walters argues defense counsel was ineffective in failing to
> interview Mr. Chappelle and have him testify for the defense.  In support, Mr.
> Walters relies on the declaration of Mr. Chappelle, who claims that he owes his
> life to Mr. Walters.

> Even if counsel arguably should have obtained Mr. Chappelle's testimony,
> there is no reasonable probability that the jury would have acquitted Mr. Walters.
> Much of the incident was recorded on the gas station's video surveillance system.
> Mr. Washington produced a shotgun and fired it over Mr. Chappelle's head.  Mr.
> Chappelle fled immediately and did not return.  Mr. Walters then produced a
> handgun and started shooting at Mr. Washington, hitting him in the groin area.
> Mr. Washington fell to the ground and dropped the shotgun.  Mr. Walters kept
> shooting at Mr. Washington, who rolled around, got up off the ground and started
> running in a zig-zag pattern around the gas pumps before running across Rainier
> Avenue with Mr. Walters in pursuit, still shooting.  The police recovered 15
> empty handgun cartridge cases from the scene, indicating the number of shots Mr.
> Walters had fired at Mr. Washington after Mr. Chappelle fled.  The prosecutor
> informed the jury that it could convict Mr. Walters on the basis of his act of
> shooting at Mr. Washington after he fell and tried to run away.  In light of the
> continuous nature of the shooting after Mr. Chappelle fled, it is unlikely Mr.
> Chappelle's testimony would have led to an acquittal.

Dkt. 12, Exhibit 32, at 3-4.

The Washington courts applied the proper standard in evaluating Mr. Walters' claim that

his counsel rendered ineffective assistance by failing to call Mr. Chappelle as a defense witness

REPORT AND RECOMMENDATON- 20

and reasonably rejected this claim. In addition, Mr. Walters fails to show that if Mr. Chappelle had been prepared to make that statement at his trial, that the result of the proceeding would have been any different. Mr. Walters fails to show the state court decision of this claim was contrary to or an unreasonable application of clearly established federal law and therefore, federal habeas relief as to Claim 4 should be denied.

## CERTIFICATE OF APPEALABILITY

If the district court adopts the Report and Recommendation, it must determine whether a certificate of appealability ("COA") should issue. Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). A COA may be issued only where a petitioner has made "a substantial showing of the denial of a constitutional right." See 28 U.S.C. § 2253(c)(3). A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Walters-El v. Cockrell*, 537 U.S. 322, 327 (2003).

The Court recommends that Mr. Walters not be issued a COA. No jurist of reason could disagree with this Court's evaluation of his habeas claims or would conclude that the issues presented deserve encouragement to proceed further. Mr. Walters should address whether a COA should issue in his written objections, if any, to this Report and Recommendation.

## CONCLUSION

The Court recommends **DENYING** Mr. Walters' habeas petition on the merits without an evidentiary hearing, and **DENYING** the issuance of a certificate of appealability. Any objections to this Recommendation must be filed and served upon all parties no later than

**Monday, March 23, 2015.**  The Clerk should note the matter for **Wednesday, March 25, 2015,** as ready for the District Judge's consideration if no objection is filed.  If objections are filed, any response is due within 14 days after being served with the objections.  A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served.  The matter will then be ready for the Court's consideration on the date the response is due.  Objections and responses shall not exceed twelve (12) pages.  The failure to timely object may affect the right to appeal.

DATED this  2nd   day of March, 2015.


_____
BRIAN A. TSUCHIDA
United States Magistrate Judge

REPORT AND RECOMMENDATON- 22